**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

NEIL PAL,                                    :

       **Petitioner**          :       **CIVIL ACTION NO. 1:19-1589**

    **v.**                               :            **(JUDGE MANNION)**

SUPERINTENDENT, SCI-          :
GREEN, *et al.*,
                                       :

     **Respondents**

                                             :

## <u>MEMORANDUM</u>

Pending before the court is the report of United States Magistrate Judge Martin C. Carlson, which recommends that that the petition for writ of habeas corpus filed in the above-captioned matter be denied and a certificate of appealability not issue. (Doc. 19).[1] The petitioner has filed objections to

---

Without excuse, the court notes that an oversight in case management has resulted in a decision on this matter being long overdue. However, rather than filing a notice on the docket to bring the matter to the court's attention, the petitioner's present counsel instead proceeded to file a petition for writ of mandamus in the Third Circuit Court of Appeals. *See* United States Court of Appeals, Third Circuit, Case No. 24-1940. Although counsel indicates in his petition that both he (Craig Cooley) and prior counsel (David Foster) corresponded with the court and that said correspondence "fell on deaf ears," a review of the docket in this matter reflects no correspondence of any kind, let alone related to the pendency of this case. In fact, since this matter was reassigned to the undersigned, except for Mr. Foster's filing of his Objections to Judge Carlson's R&R (Doc. 20) and his supporting brief (Doc. 21) there was not a single filing, notice or correspondence from Mr. Foster to alert the court that this matter had been pending for an unusually long time. Likewise,

*(footnote continued on next page)*

the report and recommendation (Doc. 20), along with a notice of supplemental authority and briefing (Doc. 21). Based upon the court's review of the record, the petitioner's objections will be **OVERRULED**, and the report and recommendation will be **ADOPTED IN ITS ENTIRETY**.

When objections are timely filed to the report and recommendation of a magistrate judge, the district court must review *de novo* those portions of the report to which objections are made. 28 U.S.C. §636(b)(1); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). Although the standard is *de novo*, the extent of review is committed to the sound discretion of the district judge, and the court may rely on the recommendations of the magistrate judge to the extent it deems proper. *Rieder v. Apfel*, 115 F.Supp.2d 496, 499 (M.D.Pa. 2000) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)).

---

despite his accusations, there is not a single filing by Mr. Cooley, except for his initial notice of appearance (Doc. 22), to notify the court that this matter has been pending without decision. Rather, his first and only filing in this matter was his entry of appearance on November 2, 2023 (Doc. 22). In response to his entry of appearance, a docket annotation by the Clerk of Court reflects that counsel was notified that he was required to either file for *pro hac vice* or general admission as he is not currently admitted to practice in the Middle District of Pennsylvania. (See docket entry of 11/02/2023). Despite this notice, it does not appear counsel has done either and is currently not properly before the court in this matter. It is respectfully suggested that competent, professional counsel would notify the court in a docketed correspondence or appropriate motion if a matter is perceived to have slipped between the proverbial cracks and needed to be brought to the court's attention.

For those sections of the report and recommendation to which no objection is made, the court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b), advisory committee notes; see also *Univac Dental Co. v. Dentsply Intern., Inc.*, 702 F.Supp.2d 465, 469 (M.D.Pa. 2010) (citing *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987) (explaining judges should give some review to every report and recommendation)). Nevertheless, whether timely objections are made or not, the district court may accept, not accept, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. §636(b)(1); Local Rule 72.31.

In reviewing his objections, the petitioner makes no substantive challenge to the factual background of this matter as extracted by Judge Carlson from the Pennsylvania Superior Court decision affirming the denial of the petitioner's petition for post-conviction relief. That background is set forth as follows:

> Appellant and Jason Dominick ("Dominick") were best friends. Dominick had a long-time volatile relationship with Keri Tucker ("Tucker"). From March through May 2013, Tucker and Frank Bonacci ("Bonacci") were involved romantically, while Tucker and Dominick were not seeing each other. On May 5, 2013, Dominick sent a text message to appellant, which stated, "just so you know, [appellant], I'm cool with your boy [Bonacci], but if he ever gets cocky around me I will just snuff him." Bonacci and

Tucker stopped dating in May 2013 as Tucker and Dominick resumed their relationship.

On June 8, 2013, Dominick challenged Bonacci to meet him at Roaring Brook Step Falls ("Step Falls") and fight following the receipt of a text message from Bonacci concerning Tucker and an incident in which Bonacci bumped Tucker at a bar. Bonacci alerted appellant by text that Dominick wanted to fight him. Appellant went to Step Falls and met Dominick and Tucker. Appellant spoke to Bonacci by telephone and encouraged him to come and fight Dominick. Bonacci did not come to Step Falls.

At approximately 2:30 a.m. on July 20, 2013, Bonacci arrived at a party hosted by appellant. By 6:00 a.m., all of the partygoers had either left or retired for the night except for appellant, Dominick, Bonacci, and Brandon Emily ("Emily"). Appellant told Emily that he was going to drive Dominick and Bonacci to their respective apartments in Bonacci's Jeep. At approximately 6:50 a.m., Emily heard the Jeep start. A University of Scranton surveillance camera that was located a few blocks from appellant's residence videotaped Bonacci's Jeep as it crossed railroad tracks and approached an access road for Step Falls at 6:51 a.m.

On July 27, 2013, police located Bonacci's decomposing body in the front passenger seat of his Jeep at the bottom of a steep embankment in a wooded area near Step Falls less than one mile from appellant's residence. The police deduced that Bonacci had not been operating the Jeep when it went down the embankment and 72-foot ravine. As part of the autopsy, Gary Ross, M.D., determined that Bonacci's cause of death was a single gunshot wound to the head and manner of death was termed a homicide. Police arrested appellant on August 1, 2013.

Following a jury trial, appellant was convicted of first-degree murder (accomplice) and criminal conspiracy on June 12, 2014,

and was sentenced to an aggregate term of life imprisonment on September 5, 2014. [2]

(Doc. 19, pp. 3-4) (citing (Doc. 15-16, Ex. M., at 2-4) (citations omitted)).

The court would add that, in relation to the events surrounding Bonacci's death, the petitioner admitted to driving Dominick and Bonacci to the Step Falls. He admitted he was present when Dominick shot Bonacci execution style in the back of the head. Finally, he admitted that he actively engaged in covering up the murder after the fact. With these admissions, the petitioner's theory at trial was that he was not aware that Dominick had a gun or that he planned on killing Bonacci, but that he thought he was taking them to the Step Falls to fight.

After exhausting his available state court remedies,[3] the petitioner filed the instant petition for writ habeas corpus pursuant to 28 U.S.C. §2254. The following four grounds for relief are raised in the petition: (1) ineffective

---

[2] For his part in Bonacci's murder, Jason Dominick was tried separately and convicted in May of 2014 of third-degree murder and conspiracy to commit third-degree murder. He was sentenced to two consecutive sentences of 20 to 40 years in prison, resulting in an aggregate sentence of 40 to 80 years of imprisonment.

[3] Petitioner filed post-trial motions, as well as a petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.Cons.Stat. §§9542, *et seq.*, which were denied. As to each, the Superior Court affirmed and petitions for allowance of appeal were denied.

assistance of counsel in failing to object to the trial court's sequestration order during his cross-examination; (2) ineffective assistance of counsel in failing to object to the opinion testimony of Michael Schultz, a detective with the Major Crimes Unit of the Scranton Police Department; (3) abuse of discretion by the trial court in refusing to grant his request for a change of venue; and (4) abuse of discretion by the trial court in allowing evidence of "prior bad acts" to be admitted in at trial in violation of the Pennsylvania Rules of Evidence. (Doc. 1).

Petitioner's claims are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") which provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254.

To establish that the decision was contrary to federal law "it is not sufficient for the petitioner to show merely that his interpretation of Supreme

Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Matteo v. Superintendent*, 171 F.3d 877, 888 (3d Cir. 1999). Similarly, a federal court will only find a state court decision to be an unreasonable application of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.*

The standard for obtaining habeas corpus relief under the AEDPA is "difficult to meet." *Scarlett v. Superintendent of SCI-Greene*, 2023 WL 8373173, at *4 (M.D. Pa. Dec. 4, 2023) (quoting *Mays v. Hines*, 592 U.S. 385 (2021) (citation omitted)). Federal habeas corpus relief is meant to guard against "extreme malfunctions in the state criminal justice systems" and is not meant to substitute for "ordinary error correction through appeal." *Id.* (citing *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (citation omitted)). "Federal habeas courts must defer to reasonable state-court decisions," *Id.* (citing *Dunn v. Reeves*, 594 U.S. ___, 141 S. Ct. 2405, 2407 (2021)), and may only grant habeas corpus relief when the state court's decision "was so lacking in justification" that its error was "beyond any possibility for fair-minded disagreement." *Id.* (citing *Mays*, 141 S. Ct. at 1149 (quoting *Harrington*, 562 U.S. at 102)). When a claim has been decided on its merits

- 7 -

in state court, federal court review of the claim is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)).

In the instant petition, the first two grounds for relief raised by the petitioner are claims of ineffective assistance of counsel. Petitioners seeking a writ of habeas corpus based on allegedly ineffective assistance of trial counsel must show: (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's deficient performance caused prejudice to the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).[4] The court's analysis as to whether counsel's performance was deficient must be "highly deferential" to counsel, and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. To establish that counsel's performance caused prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The petitioner must make both showings in order for it to be

---

[4] The Third Circuit has found that the Pennsylvania test for ineffective assistance of counsel is not contrary to *Strickland*. *See Jacobs v. Horn*, 395 F.3d 92, 107 n.9 (3d Cir. 2005) (citation omitted).

said that his conviction resulted from a breakdown in the adversary process that renders the result unreliable. *Id.* at 687.

The court's analysis is "doubly deferential" when a state court has already decided that counsel's performance was adequate. *Dominick v. Capozza*, 2023 WL 6626135, at *4 (M.D. Pa. Oct. 11, 2023), *certificate of appealability denied sub nom*. *Dominick v. Superintendent Fayette SCI*, 2024 WL 1997129 (3d Cir. Apr. 1, 2024) (citing *Dunn*, 141 S. Ct. at 2410). The court must apply a high level of deference both to counsel's actions and to the state court's determination that counsel's actions were constitutionally adequate. *Id.* (citing *Id.*; *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted)). The federal court may only grant habeas corpus relief if "**every** 'fair-minded jurist' would agree that **every** reasonable lawyer would have made a different decision." *Id.* (citing *Dunn*, 141 S. Ct. at 2411 (emphasis in original) (citation omitted)).

Turning then to the claims raised in the instant petition, in his first ground for relief, the petitioner argues that his trial counsel were ineffective for failing to object to his sequestration from counsel during an overnight break in his cross-examination and prior to closing arguments. In this regard, it is argued that on the next-to-last day of trial, the petitioner was under cross-examination when the court recessed the proceedings for the day. Upon

dismissing the jury, the court instructed the petitioner that he was not to speak to anyone, including counsel, until his cross-examination was completed the following day. Counsel did not meet or speak with the petitioner until after his cross-examination the following day at which time counsel rested the defense case. Citing to *Geders v. United States*, 425 U.S. 80 (1976), the petitioner argues that the sixteen-hour sequestration from his attorneys violated his constitutional right to counsel, and any denial of the right to consult with counsel is *per se* reversible error requiring no proof of prejudice. While counsel acknowledges that an exception to the *Geders* rule was made in *Perry v. Leeke*, 488 U.S. 272 (1989), wherein the court allowed a brief sequestration during a fifteen-minute recess, the petitioner argues that the sequestration in his case was a sixteen-hour recess, the type recognized and prohibited in *Geders*. The petitioner argues that counsel was ineffective for failing to know the law of *Geders* and for failing to object to the court's ruling on the sequestration.

The Superior Court opinion addressing the appeal of the petitioner's PCRA denial summarizes the state courts' rulings on this claim:

> On June 11, 2014, appellant was testifying on direct examination when the trial court called for a mid-afternoon break at 3:30 p.m. Cross-examination commenced shortly thereafter. At approximately 4:45 p.m., the trial court called for a recess until the next morning.

After the jury existed the courtroom, the trial court, appellant, Attorney Walker, appellant's counsel, Curt Parkins, Esq. ("Attorney Parkins"), the Commonwealth's attorneys, William Fisher, Esq. ("Attorney Fisher"), and Brian Gallagher, Esq. ("Attorney Gallagher"), engaged in the following discussion:

THE COURT: Because of the fact that you are under examination nobody, including your lawyers, can talk to you. Do you understand?

[Appellant]: Yeah.

THE COURT: Counsel, I instructed him about being under examination and not being able to speak to you.

[Attorney Walker]: It's difficult to prepare our closing without consulting with the client.

THE COURT: What was that?

[Attorney Walker]: It's difficult to prepare a closing without consulting with your client.

THE COURT: What else do you have to –

[Attorney Walker]: I don't know, Judge. The Schultz examination was timed by the District Attorney's Office so it wasn't broken, that's all I can say.

THE COURT: I'm sorry?

[Attorney Walker]: That's all I can say. Schultz's examination was timed by the District Attorney's Office so it would not be broken. They decided to put filler witnesses on and take him the next day and now – and their reasoning was that they didn't want his examination broken, and the inability to consult with him as a prosecutor.

THE COURT: Are you planning on going out to the jail tonight?

[Attorney Walker]: I was going to consult with him on the preparation of my closings.

THE COURT: Going out to the jail tonight?

[Attorney Fischer]: My position would be, Judge, is the case law says that counsel cannot discuss any matters in the trial with the witness while he is on the stand and that's a defendant case.

THE COURT: Yea.

[Attorney Walker]: I'm well aware of the case law. I'm just saying –

THE COURT: Do you want us to disregard the case law?

[Attorney Walker]: No, I just wanted a point for the record to say that the Commonwealth timed the questioning on Schultz based on their [sic] didn't want to break the questioning and wanted him available so they put two filler witnesses in.

\*\*\*

[Attorney Fischer]: What's the alternative? What are your suggestions?

[Attorney Walker]: I don't have a suggestion. I made one of him staying up on the stand, but –

At the PCRA hearing with respect to the sequestration order, Attorney Walker testified on cross-examination that he did object to the trial court's directive that appellant not speak with his counsel until after his testimony was complete: "I think that record is abundantly clear that I was, in fact, objecting. I may have not used the term objection. But I said something to the effect of that I couldn't talk to him that I was upset about that and that the Commonwealth did something with Schultz.

Attorney Walker further testified that appellant was "perfectly okay" with the trial court's sequestration order.

- 12 -

Attorney Walker stated that he did not plan to see appellant that night. Attorney Walker also testified that after the conclusion of cross-examination the next day, he had the opportunity to speak with appellant, and appellant didn't express any concerns over his inability to speak with Attorney Walker the night before. When Attorney Walker talked with appellant at the break after his cross-examination, appellant had no input into the closing argument.

Appellant testified that his only opportunity to speak with his counsel was during the brief mid-morning recess. On cross examination, when asked whether Attorney Walker objected to the sequestration order, appellant answered, "He questioned it, yes."

In ruling on this issue, the PCRA court acknowledged that if appellant had been deprived of his right to counsel under the Sixth Amendment to the United States Constitution and trial counsel had not objected to the deprivation of constitutional rights, then review of the issue was properly a matter of collateral review. *See Commonwealth v. Kennedy*, 959 A.2d 916, 922 (Pa. 2008), *cert. denied*, 556 U.S. 1258 (2009).

However, the PCRA court determined that appellant's argument failed because his counsel, Attorney Walker, did object to the sequestration order. The PCRA court reasoned that while Attorney Walker did not say the words, "I object," his comments to the court were sufficient to constitute an objection and preserve the issue for post-trial and appellate review.

A review of the trial record confirms that Attorney Walker vigorously protested the trial court's sequestration order and engaged in argument with the trial court and opposing counsel. Further, when he testified at the PCRA hearing, Attorney Walker unequivocally testified that he did object. Also at the PCRA hearing, appellant conceded that Attorney Walker verbally questioned the order.

In *Commonwealth v. Turner*, 450 A.2d 9, 11 (Pa.Super. 1982), this court held that defense counsel, in effect, made an objection to the admissibility of a witness's testimony, even

- 13 -

though the defense counsel did not utter the magic words, "I object." Therefore, Attorney Walker's comments were sufficient to constitute an objection. Consequently, appellant's argument that his counsel failed to object is without merit. Counsel cannot be considered ineffective for failing to assert an objection when counsel did raise the objection at trial. *See Commonwealth v. Johnson*, 828 A.2d 1009, 1015 (Pa. 2003). This court concludes that the record supports the PCRA court's factual findings on this issue and that the PCRA court did not err in making its legal conclusion. Appellant did not meet the first prong of the test for ineffective assistance of counsel as he did not raise a claim that has arguable merit.

(Doc. 15-16, pp. 6-11).

In addressing this first ground for relief in his report and recommendation, Judge Carlson initially concluded that the trial judge's order did not constitute a *per se* deprivation of the petitioner's Sixth Amendment right to counsel.[5] Judge Carlson then found that the petitioner has not made the required showing of ineffective assistance of counsel under the *Strickland* standard. In doing so, Judge Carlson provided:

> On this score, Pal argues that his counsel was ineffective for failing to object to the sequestration order and that he was prejudiced as a result, as he wanted to discuss with counsel the possibility of calling additional witnesses. However, the record is clear that counsel, in fact, objected to the court's order. As the PCRA court noted:
>
>> After accusing the Commonwealth of intentionally timing Detective Schultz's testimony so as to avoid a

---

[5] *See* Doc. 19, pp. 15-19. The court finds it need not address this particular issue as the ground for relief raised in the petition is ineffective assistance of trial counsel for failing to object to the sequestration order.

sequestration over the weekend, Pal's trial counsel expressly objected to the Commonwealth's requested sequestration of Pal when the trial was recessed during his cross-examination. To that end, defense counsel asserted that "[i]t's difficult to prepare our closing without consulting with the client," and claims that he "was going to consult with [Pal] on the preparation of my closing." Although the court twice asked defense counsel if he had intended to visit the county prison to meet with Pal that evening, Pal's counsel never answered those inquiries.

Pal's trial counsel conceded under oath that, in reality, he never "plan[ned] to talk to [Pal] about his closing," nor did he intent (sic) to visit him at the prison, and for that reason, he never answered the court's suggestions in that regard. He further admitted that he was simply "venting" about Detective Schultz's lack of sequestration and "posturing" with the prosecution when he feigned that he desired to consult with Pal to prepare for his closing argument.

Indeed, at the PCRA hearing, Pal's counsel stated, "I think that record is abundantly clear that I was in fact, objecting." Thus, in affirming the PCRA court's denial of Pal's petition, the Superior Court, relying on *Commonwealth v. Turner*, 450 A.2d 9, 11 (Pa. Super. 1982), found that Pal's counsel's protest of the order, while lacking the formal words "I object," was sufficient to constitute an objection. Accordingly, we cannot conclude that counsel's performance was deficient and that he was ineffective for his failure to object to the court's order when the record demonstrates that he did, in fact, object.

Moreover, even if counsel's performance could somehow be considered deficient, Pal cannot show that he suffered any prejudice. In his petition, Pal claims that he desired to call three witnesses - two witnesses who had testified for the Commonwealth, Brandon Emily and Keri Tucker, and the defense's private investigator, Joe Cocco. However, the PCRA court found that these witnesses would not have been permitted to testify at trial given Pal's proffer of their testimony, as "their proposed testimony clearly would have been redundant and

needlessly cumulative." (Doc. 15-13, at 41). Additionally, as the PCRA court noted, "there was a 15 to 20 minute break in the proceedings after Pal's testimony," and "Pal [ ] agreed that he spoke with his trial counsel at that time." On this score, there is no evidence in the record that Pal conveyed to his attorneys that he wanted to call a witness or recall certain Commonwealth witnesses. To the contrary, at the PCRA hearing, there was evidence that counsel informed the trial court prior to Pal's cross examination that Pal would be the defense's sole witness.

Accordingly, given that Pal's proffered witnesses would not have been permitted to testify regardless of the court's sequestration order, Pal cannot establish that he was prejudiced by the court's order or counsel's alleged failure to object. We are mindful that the Supreme Court has observed that a "doubly deferential judicial review . . . applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas"). Given this deferential standard, we cannot conclude that the state courts' decisions were an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. To the contrary, the PCRA court's careful analysis of this ineffective assistance of counsel claim, and the Superior Court's decision affirming that analysis, is thorough and well-supported by both the law and the facts of the petitioner's case. Accordingly, this claim does not warrant habeas relief.

(Doc. 19, pp. 19-22) (record citations omitted).

In his objections to Judge Carlson's report, the petitioner initially cites

to that portion of the report wherein Judge Carlson quoted his counsel as

saying, "I think the record is abundantly clear that I was in fact, objecting,"

(Doc. 20, p. 3)(citing Doc. 19, p. 20). The petitioner argues that, although trial counsel "complained" about the ruling, he never actually objected.

In reviewing the petitioner's argument, the court agrees with Judge Carlson that the state courts' determination that counsel's actions constituted an objection should not be disturbed. Both the PCRA and Superior courts found that under Pennsylvania law arguments by counsel in opposition to trial court rulings are adequate to equate to an objection even if counsel does not use the phrase "I object." The petitioner himself acknowledged at the PCRA hearing that counsel challenged the sequestration ruling. Even if he would like to argue otherwise now, the petitioner points to no authority upon which the court can overturn the state courts' findings.

This court must give a high level of deference not only to counsel's actions, but also to the state courts' determination that counsel's actions were adequate. Here, the state court determined that the exchange which occurred between counsel and the court after the court's sequestration order was sufficient to be considered an objection and to preserve the issue for post-trial and appellate review. Given this, the Superior Court found that petitioner failed to establish even the first prong of the ineffective assistance of counsel standard, i.e., that counsel's representation fell below an objective

standard of reasonableness. Counsel cannot be faulted for failing to object where he has, in fact, been found to have objected.

The petitioner has not established that he is entitled to habeas relief even as to the first prong of the *Strickland* standard. However, even if the court were to proceed to the second prejudice prong of *Strickland*, the petitioner argues that the prejudice suffered by his counsel's alleged failure to object was that he was unable to have input in the closing arguments of his case or to discuss the possibility of recalling certain witnesses. In considering the petitioner's argument, the record first reflects that the petitioner did, in fact, have an opportunity to assist in closing arguments. The testimony at the PCRA hearing provided that, after the petitioner finished his testimony, but before closing arguments, the petitioner had an opportunity during a break to consult with his counsel about closing arguments. Counsel testified that the petitioner did not have anything to add to closing arguments. As to the recall of witnesses, as found by the state courts and discussed by Judge Carlson, the petitioner suffered no prejudice as a consequence of not being able to call the witnesses he supposedly sought, as all three witnesses would have been excludable as cumulative and/or duplicative.[6]

---

[6] As a corollary to his initial ground for relief, the petitioner argues that the sequestration order violated his Sixth Amendment right to counsel as he

*(footnote continued on next page)*

The petitioner has not established that counsel's representation fell below an objective standard of reasonableness or that he suffered any prejudice under *Strickland.* The petitioner's objections to the report of Judge Carlson will be overruled on this ground and Judge Carlson's report will be adopted in its entirety.

In his second ground for relief, the petitioner argues that his attorneys were ineffective for failing to object to the testimony of Michael Schultz, a detective with the Major Crimes Unit of the Scranton Police Department, regarding his "interpretations" of text messages, emails, phone calls and Facebook entries by petitioner, his co-defendant and other witnesses prior to and after the murder. He further argues that his trial counsel compounded the error by then eliciting on cross-examination the detective's opinions on petitioner's intent, credibility and actual guilt.

In briefing this issue in the PCRA court, the petitioner identified three (3) specific instances as constituting ineffective assistance of counsel

---

was unable to discuss calling additional witnesses and closing arguments with counsel. However, as indicated, the substantive issue raised by the petitioner is whether counsel was ineffective for failing to object to the court's admonition. Every court to consider the issue, including this one now, has found that the petitioner has not established an ineffective assistance of counsel claim with respect to this ground for relief.

regarding Detective Schultz's testimony.[7] The PCRA court discussed each of the three (3) specific instances:

> Pal's first cited claim of impermissible testimony relates to the text message that Dominick forwarded to Pal on May 5, 2013, in which he stated "[j]ust so you know, Neil [Pal], I'm cool with your boy Frank [Bonacci], but if he ever gets cocky around me, I will just snuff him." Detective Schultz stated that he considered that particular text message significant because Dominick was allegedly "telling Neil Pal that if Frankie [Bonacci] ever gets cocky with him again, he's going to kill him." Pal asserts that the failure to object to that questioning "buttressed the prosecution case" by permitting Detective Schultz to state that Pal "was well aware that Jason Dominick would kill" Bonacci.

> The Pennsylvania Rules of Evidence do not prohibit a lay witness from offering an opinion at trial." *Com. v. Blessitt*, 852 A.2d 1215, 1218 (Pa.Super 2004). Pa.R.E. 701 contemplates the admission of lay opinions that are rationally based upon the witness's perception or personal knowledge that are helpful to the trier of fact. *Gibson v. W.C.A.B. (Armco Stainless & Alloy Products)*, 580 Pa. 470, 481, 861 A.2d 938, 944 (2004). For instance, it is proper for a police detective to narrate and describe events appearing in a surveillance video as it is being played to the jury since such commentary is rationally based on the detective's observations and assists the jury by calling its attention to specific matters depicted in the video. *Com. v. Brown*, 134 A.3d 1097, 1105-1106 (Pa.Super 2016), *app. denied*, 636 Pa. 657, 145 A.3d 161 (2016). *See also, Blessitt, supra* (officer allowed to express his opinion that defendant was

---

[7] As noted by the PCRA court, without citing to specific instances, the petitioner's PCRA counsel attempted to claim that there were thirty-nine (39) occasions on which trial counsel should have objected but did not during Detective Schultz's testimony. Counsel was informed by the court that he was required to identify the specific instances which he challenged. In briefing the matter, counsel specifically addressed only three (3). (Doc. 15-13, p. 52, n. 7).

not in possession of the marked $20 bill when defendant was stopped immediately after a controlled purchase of drugs since "the money was handed off to another individual."). It is doubtful that Detective Schultz's testimony concerning the text message of May 5, 2013, was objectionable inasmuch as his brief comment appeared to be based upon his own perception of that electronic communication.

Even if that testimony was objectionable, Mr. Comerford articulated a reasonable strategic reason for not objecting. Defense counsel believed that Detective Schultz's claim, i.e., that this single text message somehow placed Pal on notice of Dominick's impending plan to kill Bonacci, "was a stretch" and adversely affected the detective's credibility. In attacking the soundness of Detective Schultz's conclusion during the trial, Mr. Comerford queried whether Pal, upon receiving that text message, should have "call[ed] the police to say, my God, Jason Dominick is going to kill Frank Bonacci" or traveled "to the police station and said, oh my God, I want you to file terroristic threat charges against Jason Dominick, my God, he is going to kill Frank Bonacci." Mr. Comerford "didn't think that was a credible assertion by [Detective] Schultz, two months before [the murder] that they started planning this conspiracy to murder Frank Bonacci." Based upon the "highly deferential" consideration that must be afforded to the reasonableness of counsel's decisions, *see Kelley*, 136 A.3d at 1012, it cannot be said that Mr. Comerford's strategical decision in this regard lacked a reasonable basis. *See Bardo*, 629 Pa. at 362-363, 105 A.3d at 684. Moreover, Pal has not demonstrated the requisite prejudice resulting from trial counsel's failure to object since, as Mr. Comerford aptly observed, "[t]his type of stuff is not what got [Pal] convicted."

With regard to the cross-examination and recross-examination relative to Pal's offer to drive Brandon Emily home shortly before departing with Dominick and Bonacci, Pal's trial counsel considered that evidence critical to the defense argument that Pal was unaware of Dominick's intention to murder Bonacci. In his opening statement, Mr. Comerford remarked:

And then the party is winding down and the last people that are left on the deck is (*sic*) Brandon Emily, Neil [Pal], Jason Dominick and Frank Bonacci. And if you hear me at all, ladies and gentlemen, hear me now, because what does Mr. Pal do? He knows there's going to be a fight, and like a knucklehead, he drives [Dominick] to Step Falls to fight [Bonacci]. [Pal] doesn't want to go alone because Dominick is a bigger kid, a Division I wrestler and what not, and if this fight gets out of hand between Bonacci and Dominick, he wants somebody else to help him break it up. So what does he do? He says to Brandon Emily, "come with me. Come with me. I'll give you a ride home because Frankie [Bonacci] lives close to you."

And the evidence will show that he did live close. Brandon Emily lived with an individual by the name of Corey Reilly, and Brandon [Emily] says, "well, I don't know, Neil [Pal]. I don't know because I already called Corey [Reilly] and I think Corey [Reilly] might be coming to get me, let me give him a call."

So Brandon [Emily] gets his roommate Corey [Reilly] on the phone, and subsequently, Neil [Pal] talks to Corey [Reilly]. "Corey [Reilly], let me give Brandon [Emily] a ride, I'm giving Frankie [Bonacci] and Jason [Dominick] a ride." And Corey [Reilly] says, "no, because I already left the house."

So when you talk about state of mind, about knowledge, about the fundamental issue of what you have to determine in this case, does that sound like someone that had knowledge that a murder was just going to occur? Because if he did, he just created two witnesses, and that testimony is unrefuted. That state of mind evidence [is] five minutes before Jason Dominick shoots Frank Bonacci.

In his closing summation, Mr. Walker similarly argued:

[Pal] is going to put an end to the [Dominick-Bonacci-Keri Tucker] nonsense. We are going down to Step Falls, and Step Falls is a location where they fight, and [Pal] drives

[them] down, while he is down there, Jason Dominick shoots this guy execution style in the back of the head.

***

If [Pal] knew what was going on, he is probably the worst conspirator or worst planner I ever met. They are going to commit a murder and they are going to do so at Step Falls in secret in the woods where nobody sees them, but [Pal] tells Sam Senuk about it first, then he tells Brandon Emily, "why don't you come with me" so I have another witness, and maybe I'll have a witness to a murder, I have another witness that I rode in a car with, a guy that died this morning! And I'm going to call Corey Reilly on the phone, and I'm going to say, "hey, I'm giving these guys a ride home!"

Three of the ineffectiveness claims addressed in Pal's brief concern Mr. Comerford's cross-examination and recross-examination relating to Brandon Emily and Pal's attempt to drive him home in Bonacci's Jeep. While cross-examining Detective Schultz, Mr. Comerford characterized Pal's offer to drive Mr. Emily home as proof "that Neil Pal didn't appreciate what was about to happen at Step Falls," that Pal believed that Dominick and Bonacci would simply fight, and that Pal "brought Brandon Emily with him in case the fight escalated and Brandon [Emily] helped him break it up." Mr. Comerford also attacked Detective Schultz for submitting an affidavit of probable cause to the assigned Magisterial District Judge which referenced Brandon Emily and his presence on Pal's back porch as Pal, Dominick and Bonacci departed on the morning of July 20, 2013, but neglected to mention "that 25 minutes before Frank Bonacci is shot, Neil Pal asked [Brandon Emily] if he wants a ride home." In his recross-examination, Mr. Comerford referenced the fact that Corey Reilly insisted that he would retrieve Mr. Emily, rather than having Mr. Emily transported by Pal, and queried:

Q. When we talk about [Pal's] knowledge, what we have is you have Brandon Emily there, he is on the porch, and you

have information that Neil [Pal] knows Corey Reilly is coming to get him, would you agree with that?

A. I agree.

Q. Why didn't [Pal] just wait ten minutes? Why doesn't he just wait ten minutes for [Brandon] Emily to leave if [Pal] knows what's about to transpire? ...You are indicating Pal had full knowledge that Jason Dominick was about to put a bullet in the back of Frank Bonacci's head. My question to you is [Brandon] Emily is on the back porch, Pal asked [Brandon] Emily for a ride, [Brandon] Emily says no, Corey [Reilly] is coming to get me. Pal talked to Corey [Reilly] and says, "I'll give Brandon [Emily] a ride." Corey says, "no, I'm coming to get [Brandon Emily]." Why doesn't Neil [Pal] just wait for [Brandon] Emily to disappear from the scene?

A. I couldn't tell you.

Q. Well, the other answer would be because [Pal] didn't know.

A. No.

Q. He didn't know what was about to happen.

A. I disagree, I believe he knew 100 percent what was going to happen to Frankie [Bonacci].

The sole retort offered by Detective Schultz for Pal's offer to drive Brandon Emily home with Dominick and Bonacci was that "Brandon Emily could have got (*sic*) in the car and been a victim himself." Mr. Comerford believed that Detective Schultz's hypothesis, i.e., that Pal intended to kill Brandon Emily too, "was the biggest stretch ever" because it had "no basis in fact" and any jury could see that." According to Mr. Comerford, this line of questioning enabled the defense to "get our theory out through my legal questions" while simultaneously demonstrating that Detective Schultz was "one-sided" and "biased when there's another obvious interpretation of the text messages that [he] won't concede," and that "when there was (*sic*) obvious facts presented to him that were favorable to the defense, he refused to interpret them that way." This examination also afforded the defense the opportunity to present "text messages that [we] believe strongly support the conclusion that Pal did not know, that there was a reasonable interpretation of the evidence that was consistent with Pal believing there was only going to be a fight." Mr. Comerford anticipated that Detective Schultz would

disagree with the defense's interpretation of the text messages, and believed that it was "pretty obvious to the jury that [Schultz] would disagree," but viewed it as an occasion to challenge Detective Schultz's credibility and permit the jury to hear evidence and argument favorable to Pal, such as the fact that Pal had "no motive" to kill Bonacci, that there was "consistent [friendly] contact between Pal and Bonacci" in the days and weeks before the murder, and "that there was limited contact between Pal and Dominick in the month or two before the murder."

Pal admitted (a) being present in Bonacci's Jeep at the time that he was murdered, (b) actively participating in the cover-up of that murder, and (c) lying to the police regarding his involvement. In light of the incriminating forensic and testimonial evidence against Pal, his only plausible defense was to claim that he believed that Dominick intended to physically assault, rather than shoot and kill, Bonacci. Mr. Comerford's cross-examination and recross-examination discussed above represented reasonable trial strategy designed to underscore that defense and to contest the believability of the prosecution's witness. Pal has not demonstrated that this particular questioning had no reasonable strategic basis. Moreover, Pal has not established a reasonable probability that, if the foregoing cross-examination and recross-examination had not been presented, the result of the trial would have been different.

The final questioning of Detective Schultz that Pal has briefed as allegedly ineffective relates to the amicable text message exchanges between Pal and Bonacci in the weeks preceding the murder. Mr. Comerford had Detective Schultz identify and read numerous text message exchanges between Pal and Bonacci from April 19, 2013, through July 15, 2013, that reflected an amiable relationship. After presenting those communications to the jury in visual and audio format, and in an effort to attack the tenability of Detective Schultz's testimony, Mr. Comerford posited:

Q. And approximately 5 days later, according to your theory of the case, Pal was in some type of conspiracy to kill this guy; correct?

A. Absolutely.

Pal contends that this specific question "can hardly be termed reasonable trial strategy."

The defense strategy to highlight the pleasant exchanges between Pal and Bonacci, and to argue that this course of friendly conduct does not reflect a conspiracy or intent to murder Bonacci, cannot be declared as lacking a reasonable basis designed to promote Pal's interests. As with other questioning, Mr. Comerford assumed that Detective Schultz would disagree with the defense's position, but believed that the witness's unwillingness to concede any point favorable to the defense negatively impacted his credibility. Pal also has not established that if Mr. Comerford had declined to pose that single question, there is a reasonable probability that the verdict would have been different. As a consequence, Pal's claims of ineffectiveness with respect to the testimony of Detective Schultz are without merit.

(Doc. 15-13, pp. 46-53) (record citations omitted).

In affirming the PCRA court's denial with respect to this ground for relief, the Pennsylvania Superior Court expounded upon the strategy relied upon by trial counsel.

At the PCRA hearing, Attorney Comerford testified that he did not care if Detective Schultz testified as to what he thought was appellant's motive. He explained, "I didn't think it was credible. So call it strategy or what. I didn't care if he said that 25 times on the stand." When asked why he did not object more often on hearsay grounds to Detective Schultz's testimony, Attorney Comerford explained, "You got [sic] to pick your battles … I objected twice in … in four pages of testimony. I mean, I think the objection was noted. And I respected the Judge's ruling." Attorney Comerford also explained why he did not object to

Detective Schultz's explanation of the significance of Dominick's text message that he would "snuff" Bonacci if he ever got "cocky around" him:

> I didn't think that was a credible assertion by Schultz two months before that they started planning this conspiracy to murder [Bonacci]. Is that what Schultz was saying? I thought it was confusing. I thought it was a stretch. And I wanted the ability on cross examination to give the jury my own interpretation.

Attorney Comerford further explained his overall strategy with respect to Detective Schultz:

> I thought his interpretations were unreasonable. I thought he would come across to the jury as dishonest because he only interpreted things that were favorable to him in a light favorable to the Commonwealth. And when there was [sic] obvious facts presented to him that were favorable to the defense, he refused to interpret them that way.

Attorney Comerford testified that when he cross-examined Detective Schultz, that he really did not care what his answers were because the questions supported the conclusions that he was ultimately looking to put forth to the jury. According to Attorney Comerford, he did not object when Detective Schultz was asked for the significance of a particular text message or Facebook post because of 1) trial strategy, as he could then ask a leading question on cross-examination, and 2) the vast majority of the questions related to facts that the defense conceded.

On cross-examination, Attorney Comerford further explained that it was his strategy to concede that appellant participated in a cover-up of the crime after it happened. In addition, he added that many of the text messages between Dominick and Bonacci indicated a problem between the two, which could indicate motive, and some text messages before the crime from Dominick indicated that he was having some sort of emotional breakdown unbeknownst to appellant.

- 27 -

Attorney Comerford stated that he asked Detective Schultz questions on cross-examination knowing that his answer would favor the Commonwealth in an effort to have him lose credibility in the eyes of the jury.

The PCRA court determined that Detective Schultz was permitted to interpret the text message from Dominick to appellant that stated Dominick would "snuff" Bonacci if he got cocky as Dominick was stating he would kill him because he was testifying based on his own perception of the electronic communication under Rule 701 of the Pennsylvania Rules of Evidence. Even if Detective Schultz's testimony was objectionable, the PCRA court concluded that Attorney Comerford articulated a reasonable strategic reason for not objecting because he believed that Detective Schultz's claim that this text message placed appellant on notice that Dominick might kill Bonacci "was a stretch" and had a negative effect on Detective Schultz's credibility. The PCRA court further determined that appellant's counsel had a reasonable strategic basis not to object as often as appellant believes he should have.

Appellant also asserts that after Attorney Comerford had Detective Schultz identify text messages between Bonacci and appellant that reflected a friendly relationship, Attorney Comerford asked Detective Schultz if he believed that appellant engaged in a conspiracy to kill Bonacci within five days after the last of these messages. Detective Schultz answered, "Absolutely." Appellant does not believe that was reasonable trial strategy.

With respect to this issue. The PCRA court determined that Attorney Comerford's strategy to damage Detective Schultz's credibility by showing his unwillingness to concede any point favorable to appellant was reasonable and designed to promote appellant's interests.

(Doc. 15-16, pp. 12-15) (record citations omitted).

In affirming the PCRA court's decision, the Pennsylvania Superior Court provided:

> With regard to the reasonable basis prong, a court will conclude that a strategy is not reasonable if an appellant proves that an alternative strategy offered a potential for success substantially greater than the course that was actually pursued. *See Commonwealth v. Spotz*, 18 A.3d 244, 260 (Pa. 2011). Counsel is not constitutionally required to put forth all possible objections at trial and the reasonableness of counsel's performance is "not measured by an exercise in 'spot the objection,' as might occur in a law school evidence examination." *Commonwealth v. Spotz*, 870 A.2d 822, 832 (Pa. 2005). Here, the PCRA court did not err when it concluded that Attorney Comerford's strategy was reasonable because appellant did not prove that an alternative course had the potential of providing a substantially greater chance of success than the route chose by counsel.

(Doc. 15-16, pp. 15-16).

In ruling on this second ground for relief, Judge Carlson looked at each of the three (3) specific areas where the petitioner claims counsel should have objected and reviewed the state courts' decisions with respect to those areas as set forth above. In concluding that this ground does not warrant habeas relief, Judge Carlson reasoned:

> Here, we cannot conclude that the state court's application of *Strickland* was unreasonable or that the courts' decisions were based on an unreasonable application of the facts. The record indicates that Pal's counsel pursued a strategy that best represented his interests at trial, given the evidence against him. Again, we are reminded that the Supreme Court has observed that a "doubly deferential judicial review ... applies to a *Strickland* claim evaluated under the §2254(d)(1) standard." *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009); *see also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas"). Given this deferential standard, we cannot conclude that the state courts' decisions were an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. To the contrary, the PCRA court's analysis of this ineffective assistance of counsel claim, and the Superior Court's decision affirming that analysis, is thorough and well-supported by both the law and the facts of the petitioner's case. Accordingly, this claim does not warrant habeas relief.

(Doc. 19, pp. 26-27).

Upon review, a vast majority of the petitioner's objections to Judge Carlson's report are simply a reiteration of the arguments raised in his state court filings and in the instant petition. He does argue specifically as to the report however that, contrary to Judge Carlson's finding that the record reflects that "[his] counsel pursued a strategy that best represented his interests at trial given the evidence against him," the strategy with greater potential for success would have been to prevent the objectionable testimony as outlined above. In fact, the petitioner argues that his trial counsel's strategy "was not the best strategy, it was certainly not the strategy that had a greater potential for success, and in fact that strategy was *manifestly unsound*." (Doc. 20, p. 36)(emphasis in original). Moreover, despite Judge Carlson's finding to the contrary, the petitioner argues that the state courts

engaged in an unreasonable application of *Strickland's* standard, which entitles him to habeas relief.

The task of this court under the AEDPA is simply to determine whether, affording deference and latitude to the state courts, a fair-minded jurist could agree with their holding that counsels' strategical decisions with regard to Detective Schultz's testimony had a reasonable basis. *Fowler v. Superintendent Smithfield SCI*, 702 Fed.Appx. 44, 48-49 (3d Cir. 2017) (citing *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). As discussed above, this court may only grant habeas corpus relief when the state court's decision "was so lacking in justification" that its error was "beyond any possibility for fair-minded disagreement." *Mays v. Hines*, *supra*. Moreover, as stated previously, with regard to an ineffective assistance of counsel claim, this court's analysis is "doubly deferential" when a state court has already decided that counsel's performance was adequate. The Supreme Court has dictated that the court must apply a high level of deference both to counsel's actions and to the state court's determination that counsel's actions were constitutionally adequate. *See Knowles v. Mirzayance*, *supra*. In fact, as indicated, the court may only grant habeas corpus relief if "**every** 'fair-minded jurist' would agree that **every** reasonable lawyer would have made a different decision." *Id.* (citing *Dunn*, 141 S. Ct. at 2411 (emphasis in original) (citation

omitted)). In making this determination, "[w]e must 'eliminate the distorting effects of hindsight' and recognize that '[t]here are countless ways to provide effective assistance in any given case.'" *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 724 (3d Cir. 2022) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

As indicated both by counsel and the state courts, there is not much doubt that trial counsel had few defense avenues to pursue in the petitioner's case. The petitioner admitted to taking Bonacci to the Step Falls. He admitted to being there when Bonacci was murdered. He admitted to covering up the murder for a period of time. He admitted to lying to the police about his involvement in the murder. The forensic and testimonial evidence against the petitioner was considerable. Given these obstacles, with respect to the testimony of Detective Schultz, trial counsel had a strategy. Objections were made where it was thought necessary to prevent information from coming in which would be harmful to the petitioner and when that information would not be coming in otherwise. Where there was testimony which was conceded to by the defense or which allowed counsel the opportunity to get in the petitioner's theory of the case through cross-examination, objections were not made. Where it was thought there was an opportunity to discredit Detective Schultz in the eyes of the jury, trial counsel solicited testimony

which they thought would do so. Counsel had a strategy, and given the circumstances of the petitioner's case, the state courts found it was a reasonable strategy.

Whether the petitioner believes with the benefit of hindsight that trial counsel's strategy was not the "best" strategy or that there was a better strategy that should have been pursued, is of no consequence. Courts must defer to counsel's tactical decisions, avoid "the distorting effects of hindsight," and give counsel the benefit of a strong presumption of reasonableness. *Strickland*, 466 U.S. at 689. Giving trial counsel the deference counsel is due, both the PCRA court and the Superior Court determined that petitioner's counsel were not ineffective in relation to the challenges involving Detective Schultz's testimony as it could not be said that trial counsel's strategical decisions lacked a reasonable basis. Considering the double deference due to the state courts and counsel in these proceedings, and considering the high bar the petitioner must clear in order to be entitled to habeas relief, the court simply cannot find that the petitioner is entitled to relief on this ground.[8]

_____

[8] The court notes that, in further support of this claim, the petitioner submitted supplemental authority, that being *United States v. Diaz*, 951 F.3d 148 (3d Cir. 2020). In *Diaz*, the Third Circuit found, among other things, that the trial court erred in failing to exclude testimony provided by an FBI agent

*(footnote continued on next page)*

The next two grounds for relief by the petitioner claim abuse of discretion by the trial court. In his third ground for relief, the petitioner argues that the trial court abused its discretion in refusing to grant a change of venue in light of the inflammatory and widespread pretrial publicity in this case, particularly the social media and Facebook page dedicated to Bonacci. The petitioner argues that this was presumptively prejudicial because there was no "cooling off" period between Dominick's trial, at which he claimed the petitioner was the actual shooter, and his own trial. (Doc. 1, pp. 70-100).

Judge Carlson aptly provided the state of the law on such matters as follows:

> The Fourteenth Amendment guarantees criminal defendants the right to "a trial by an impartial jury from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). However, this guarantee does not prohibit, at the request of the defendant, the transfer of the proceeding to a different district "if extraordinary local prejudice will prevent a fair trial - a 'basic requirement of due process.'" *Skilling v. U.S.*, 561 U.S. 358, 377 (2010). Thus, "when prejudicial pretrial publicity wholly undermines the impartiality of the jury, the trial court should take steps to assure a fair trial granting a change of venue or venire." *Stevens v. Beard*, 701 F.Supp.2d 671, 725 (W.D.Pa. 2010)

---

in which "he improperly and unhelpfully offered his opinion on the ultimate issue at trial: Diaz's involvement in the conspiracy [ ]" and gave "testimony interpreting a number of non-coded statements" under Fed.R.Evid. 701(b). However, the issue in the instant action is not whether the trial court erred in allowing in testimony which should have been excluded under the rules of evidence, but whether counsels' strategic decisions not to object to certain testimony had a reasonable basis such that counsels' conduct could not be deemed ineffective assistance of counsel.

(citing *Sheppard*, 384 U.S. at 363; *Rideau v. Louisiana*, 373 U.S. 723 (1963)).

On this score, the Supreme Court of the United States has held that "only the extreme case" of pretrial publicity will result in a presumption of prejudice. *Id.* at 380-81. After discussing several of its prior cases involving the question of prejudicial pretrial publicity, the Court stated:

> In each of these cases [*Rideau*, 373 U.S. 723; *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard*, 384 U.S. 333], we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 798-799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *See also, e.g., Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States*, 98 U.S. 145, 155-156, 25 L.Ed. 244 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). A presumption of prejudice, our decisions indicate, attends only the extreme case.

*Skilling*, 561 U.S. at 380-81. Indeed, as the Third Circuit Court of Appeals has held, cases involving a presumption of prejudice are "exceedingly rare," and in order for a court to presume prejudice, "[t]he community and media reaction . . . must have been so hostile and so pervasive as to make it apparent that even the

most careful *voir dire* process would be unable to assure an impartial jury." *Rock v. Zimmerman*, 959 F.2d 1237, 1251 (3d Cir. 1992), *overruled on other grounds*, *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Moreover, in general, "a motion for a change of venue is addressed to the discretion of the trial court," and the trial court's decision to deny such a motion "will not be set aside absent an abuse of discretion." *Martin v. Warden, Huntingdon State Corr. Inst.*, 653 F.2d 799, 804 (3d Cir. 1981). In the context of a habeas corpus petition, our inquiry is "whether the refusal to change venue amounts to a denial of the defendant's constitutional rights." *Id.*

(Doc. 19, pp. 28-30).

In reviewing the state court records in this matter, the petitioner initially raised the issue of a change of venue by way of a pre-trial motion. The motion was denied, without prejudice, subject to renewal after jury selection. (Doc. 15-6, p. 42). The petitioner again raised the issue in his post-trial motions. In an exhaustive review of the matter covering over twenty (20) pages, the trial court again denied the petitioner's motion (Doc. 15-6), and that denial was affirmed on review by the Pennsylvania Superior Court (Doc. 15-9).

As discussed in the state court opinions and by Judge Carlson in his report, there were 101 members in the prospective jury pool in the petitioner's case. Of those 101 members, 98 indicated that they had seen or heard something about the case. Of those 98, 18 potential jury members stated that they could not decide the case fairly or impartially based only on

the evidence presented at trial. These 18 individuals were excused for cause. All others indicated that they could decide the case fairly and impartially based only on the evidence presented in the courtroom despite what they had seen or heard. Upon questioning regarding news and social media coverage, an additional 4 of the remaining members were stricken for cause. Further individual questioning resulted in 36 more members being stricken for separate cause reasons. With all of the foregoing members having been stricken, the court was able to seat 12 principal jurors and 4 alternate jurors. The petitioner then made a renewed attempt for a change of venue. His motion was denied with the court finding that the any media attention given to the matter was "factual and objective," rather than "sensational, inflammatory and slanted toward conviction." (Doc. 15-6, p. 43).

Although the seated jurors were told to keep away from any news reports or social media with respect to the case, one principal juror and one alternative juror were found to have posted comments to their social media pages about their selection as jurors. Both jurors were immediately dismissed from the case. (*Id.* at 44). In an attempt to prevent such matters from happening again, each day the remaining jurors were questioned as to whether they had seen or read any news reports or digital communications related to the case.

Subsequent to the petitioner's conviction, he renewed his challenge to the court's failure to provide a change of venue by way of post-trial motions. The trial court addressed the petitioner's challenge in two parts: one concerning conventional media coverage and the other concerning social media. As provided in Judge Carlson's report, as to the petitioner's challenge to conventional news media coverage, the trial court indicated:

> Pal has not demonstrated that the pre-trial news reports caused actual prejudice by preventing the impaneling of an impartial jury, nor has he established that the media coverage was presumptively prejudicial since it was sensational, inflammatory, and slanted toward conviction. The pre-trial news articles submitted for review constitute factual and objective reports of Bonacci's disappearance and murder, the arrests of Dominick and Pal, the pre-trial proceedings and rulings, and Dominick's trial. Since the conventional news reports were not presumptively prejudicial, a change of venue was not warranted in this case.
>
> Even if the conventional media coverage was somehow found to be presumptively prejudicial, Pal would not be entitled to a change of venue unless he further established that the presumptively prejudicial publicity was so pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time for the prejudice to have dissipated. *See Briggs*, 608 Pa. at 468, 12 A.3d at 314. The prospective jurors' responses during *voir dire* are the most "reliable guide[s]" in determining whether (a) there has been an adequate "cooling off" period to dissipate the impact of presumptively prejudicial publicity, or (b) "the publicity is still so fresh in their minds that is has removed the ability to be objective." *Id*. at 469, 12 A.3d at 314.
>
> Less than 22% of the jury panel stated that as a result of the conventional and social media publicity, they had formed fixed opinions about Pal's guilt or could not otherwise set aside that

pre-trial publicity. *See Tharp*, 574 Pa. at 219, 830 A.2d at 529 (holding that no change of venue was required when only 30% of the prospective jurors stated they had a fixed opinion of defendant's guilt and were excused for cause); *Com. v. Stoltzfus*, 462 Pa. 43, 54, 337 A.2d 873, 878 (1975) (finding no change of venue necessary when 22% of the venire had formed fixed opinions of defendant's guilt). Furthermore, "[a]ll of the jurors seated avowed under oath and penalty of perjury that they could decide the case based solely on the trial evidence, and that they had no preconceived or fixed opinion of [defendant's] guilt." *Briggs*, 608 Pa. at 474, 12 A.3d at 318. Additionally, following their selection as jurors, each juror was "admonished to refrain from reading, viewing or otherwise being attentive to any media reports or other outside information regarding the case and trial," and "on each day of the trial, the jury was directly asked whether any juror had read, seen, or heard any news reports or other outside information regarding the case or trial or had discussions with any persons concerning the case or trial." *Chmiel*, 612 Pa. at 405-406, 30 A.3d at 1153. Therefore, assuming arguendo that the traditional media coverage could be characterized as presumptively prejudicial, a change of venue was nonetheless unwarranted.

(Doc. 19, pp. 31-32 (citing Doc. 15-6, at 47-48)).

As to the social media aspect, as Judge Carlson provides, the trial court found:

Assuming, without deciding, that social media constitutes "pretrial publicity" for purposes of a change of venue request, Pal still has not established that a change of venue was required. The information contained on "Frankie's Voice" website and Facebook page did not create a presumption of prejudice under Pennsylvania law, nor was it "so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it." *Briggs*, 608 Pa. at 468, 12 A.3d at 314. Only four members of the 101 person venire responded affirmatively to defense counsel's voir dire questions addressing prejudicial exposure to social media comments or postings, and those four

individuals were removed from the jury pool. The jurors who decided Pal's fate were questioned daily to ensure that they had not viewed any conventional or social media reports. Therefore, the relevant social media did not prejudice Pal in empaneling an impartial jury which ultimately decided this case.

(Doc. 19, pp. 32-33 (citing Doc. 15-5, at 50-51).

In addition to the standards under state law, the trial court looked to federal law in examining the factors to consider when determining whether pretrial publicity is presumptively prejudicial as set forth in *Skilling v. U.S.*, 561 U.S. 358 (2010). In doing so, the court found that the pretrial publicity in the petitioner's case was not the kind likely to produce prejudice but was factual and objective and did not contain blatantly prejudicial information. Moreover, the court had considered that ten (10) months had elapsed between Bonacci's murder and the time of the petitioner's trial, and five (5) weeks had passed between the start of Dominick's trial and the petitioner's trial. All being sufficient to mitigate any prejudice.

On appeal, the Superior Court affirmed the trial court. In doing so, the Superior Court provided:

> We conclude that, the trial court did not abuse its discretion in denying Appellant's motion for a change of venue. As the trial court correctly pointed out, less than 22% of the venire persons formed fixed opinions about Appellant's guilt based upon conventional and social media publicity, and all jurors seated avowed that they could decide the case based solely on the trial evidence. *See Tharp, supra* at 529-30 (holding that a trial court was warranted in concluding that no change of venue was

- 40 -

required where thirty-four of one hundred prospective jurors indicated that they had formed a fixed opinion because of pretrial publicity). Accordingly, the trial court was well within its discretion in deciding that pretrial publicity did not require a change of venue. Appellant's first issue does not merit relief.

(Doc. 15-9, p. 10). Further, to the extent that the petitioner argued that the trial court erred in not allowing defense counsel to conduct individual *voir dire* of the prospective jurors because of the allegedly prejudicial pretrial publicity, the Superior Court indicated that absent an abuse of its discretion to determine the method of *voir dire* examination, the trial court's decision would not be disturbed. The Superior Court concluded that the petitioner's case was closely aligned with that of *Commonwealth v. Rovinski*, 704 A.2d 1068, 1073 (Pa.Super. 1997), *appeal denied*, 723 A.2d 1024 (Pa. 1998), wherein the Superior Court held that the trial court did not abuse its discretion when it made a general inquiry into whether any jurors had prior knowledge of the case and then "dismissed any juror with prior knowledge who did not unequivocally deny having a fixed opinion and unequivocally affirm the ability to be fair and impartial." (Doc. 15-9, p. 12 (quoting *Rovinski*, *supra* at 1073)). In the petitioner's case, the trial court inquired as to the potential jurors' personal knowledge from any sources and dismissed those individuals with fixed opinions about the matter. Further, the court allowed counsel individual *voir dire* with certain potential jurors who indicated that they had prior

- 41 -

knowledge about the case. Given this, the Superior Court found that the trial court's method of *voir dire* was well within its discretion.

In considering the state court's findings on the venue issue, Judge Carlson concluded:

> We are reminded that "[w]hen pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense.'" *Skilling*, 561 U.S. at 386) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). On this score, we cannot conclude that the state courts' decisions were based on an unreasonable application of the law or an unreasonable determination of the facts. Indeed, the Third Circuit has held that the denial of a motion for change of venue is not an abuse of discretion even where "pre-trial publicity was extensive, and there was no 'cooling off' period between the publicity and trial," given the "lack of inflammatory, sensational journalism." *U.S. v. De Peri*, 778 F.2d 963, 972 (3d Cir. 1985); *see also Altawarh v. Wetzel*, 2017 WL 48555858, at *9 (E.D. Pa. Aug. 31, 2017) (quoting *Commonwealth v. Casper*, 392 A.2d 287, 295 (Pa. 1978)) ("It is saturation with 'inherently prejudicial' publicity, and not the possibility of saturation alone, that is important since, as we have noted, '(e)xtensive pretrial publicity ... does not necessarily preclude a fair trial'"). Here, the trial court found that the conventional news coverage of Pal's case was largely factual and objective, and that the Facebook page and website entitled "Frankie's Voice," which were originally designed to solicit volunteers to search for Bonacci, consisted of hyperlinks to news stories about the trials, solicitations to fund Bonacci's funeral services, and other missing persons alerts. Thus, this is not the kind of blatantly prejudicial information that would presumptively taint a jury's impartiality and deny the petitioner his constitutional right to a fair trial. Accordingly, in our view, this claim does not afford Pal habeas relief.

(Doc. 19, pp. 34-35 (footnote and record citation omitted)).

- 42 -

In reviewing the petitioner's objections as to the change of venue issue, the petitioner generally challenges Judge Carlson's citation to and approval of the trial court's rationale for denying his change of venue motion. He then notes Judge Carlson's citation to the five factors set forth by the Supreme Court in *Skilling* for use in determining whether pretrial publicity is presumptively prejudicial and argues that, in his view, all five factors weigh in his favor. In this regard, there is simply nothing to add to Judge Carlson's analysis. Judge Carlson carefully and thoroughly reviewed the standards required to be met by the petitioner in order to demonstrate his entitlement to relief on this claim, as well as state courts' rationale for denying the petitioner relief. This court finds no error with the findings and conclusions of Judge Carlson in this regard and agrees that the state courts' decisions were not based on an unreasonable application of the law or an unreasonable determination of the facts. Judge Carlson's report will therefore be adopted in this respect and the petitioner's objections overruled.

In his fourth and final ground for relief, the petitioner argues that the state trial court abused its discretion in refusing to preclude the admission of certain "bad acts" evidence against him at trial where the prejudicial impact of such evidence significantly outweighed any probative value. As to this claim, the record demonstrates that the petitioner filed various pre-trial

motions *in limine* to preclude the admission of "bad acts" or "other acts" evidence at trial. Specifically, the petitioner "sought to preclude evidence that [he], Dominick and several of their friends had "*La Familia*" tattoos signifying their self-proclaimed gang and solidarity, that [he] had fired a weapon at or near Maribeth Castaldi and Emily Gilgallon, and that [he] had threatened or assaulted Ms. Gilgallon and Michael Castellano." (Doc. 15-6, p. 61). For reasons of relevance, as well as because the probative nature of these matters was outweighed by the potential for unfair prejudice, the trial court barred any evidence with regard to these matters at trial.

However, three evidentiary matters arose during the course of the trial which the trial court allowed. The first of these involved the petitioner's acquisition of a .38 caliber handgun from an individual by the name of Cameron Kashmer, the petitioner's discharge of that weapon into his garage wall, and a photograph of the petitioner openly displaying a handgun in the waistband of his pants. The court found these matters were admissible pursuant to the "opportunity" exception in Rule 404(b)(2) of the Pennsylvania Rules of Evidence, in that this evidence supported the Commonwealth's theory that the petitioner had the means to furnish Dominick with the murder weapon and ammunition. The trial court provided:

> In light of the pre-trial opinion expressed by the firearm and tool mark examiner, Cpl. Elwood Spencer, that bullet projectiles

removed from the wall of Pal's garage had similar lands, grooves and cannelures characteristics as the wad cutter bullet removed from Bonacci's head, we concluded:

> Rule 404(b)(2) states that proof of prior bad acts is admissible for the purpose of proving "opportunity." Pa.R.E. 404(b)(2). It is well settled that "[a] weapon shown to have been in a defendant's possession may properly be admitted into evidence even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime." *Com v. Williams*, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994); *Com. v. Brown*, 71 A.3d 1009, 1014 (Pa.Super. 2013), *app. denied*, 77 A.3d 635 (Pa. 2013). Evidence that the defendant possessed any other device or instrument that could have been used in a murder is admissible pursuant to the "opportunity" exception set forth in Rule 404(b)(2). *See Com. v. Reese*, 31 A.3d 708, 726 (Pa. Super 2011) (*en banc*) (defendant's prior display and use of "a knife in a retail store in broad daylight" was admissible since murder victim died from stab wounds); *Com. v. Miller*, 897 A.2d 1281, 1287-1288 (Pa.Super. 2006)(knife set retrieved from defendants' truck was admissible to show that defendant "was in possession of a knife which could have been one of the murder weapons."), *app denied*, 588 Pa. 789, 906 A.2d 1196 (2006); *Com. v. Akers*, 392 Pa.Super 170, 186-188, 572 A.2d 746, 754 (1990)(witness properly permitted to testify that defendant had previously shown her a gun similar to the murder weapon), *app. denied*, 526 Pa. 627, 584 A.2d 310 (1990). For that reason, evidence of handguns *and* ammunition seized from a defendant's home is "relevant as tending to prove that the defendant had weapons similar to the ones used in the perpetration of the crime," and any "[u]ncertainty whether the weapons evidence was actually used in the crime goes to the weight of such evidence, not its admissibility." *Co. v. Owens*, 929 A.2d 1187, 1191 (Pa.Super. 2007), *app. denied*, 596 Pa. 705, 940 A.2d 364 (2007).

The Commonwealth contends that Pal provided Dominick with the .38 caliber handgun and wad-cutter type practice bullet used

to kill Bonacci. In light of Corporal Spencer's opinions regarding the projectiles removed from the wall of Pal's garage, as well as the unused ammunition seized from that garage, evidence relating to Pal's ownership and discharge of wad-cutter practice bullets from a .38 caliber handgun is clearly relevant to Pal's accomplice liability. If, as Pal advocates, the Commonwealth is denied the opportunity to present evidence that Pal fired bullets into his garage wall, the jury may be inclined to conclude that Pal did not fire the retrieved projectiles into the garage wall, and that those projectiles were fired by someone other than Pal. In that event, Pal would be able to argue, without evidentiary rebuttal by the Commonwealth, that some other individual owned or controlled the bullets that were fired into the garage wall. To support its argument that Pal had the "opportunity" to furnish Dominick with the gun and bullet that were used to kill Bonacci, the Commonwealth is entitled to offer evidence that Pal fired bullets into his garage wall, which were later seized by the police and ultimately served as the basis for Corporal Spencer's analysis and conclusion. *See, Owens, supra*. While that evidence may not be admissible under the *res gestae* exception, it is relevant and admissible under the "opportunity" exception in Rule 404(b)(2) to establish that Pal had the means to provide Dominick with the gun and bullet that he used to kill Bonacci. As a result, Pal's motion *in limine* to bar the Commonwealth from referencing Pal's discharge of firearms in his garage will be denied.

Id. at *4.

Based on the holding in *Com. v. Williams*, 58 A.3d 796, 801 (Pa.Super. 2012), *app. denied*, 620 Pa. 708, 68 A.3d 908 (2013), the photograph of Pal brandishing a handgun in his waistband was deemed admissible to show his possession and control of a weapon similar to the one used to kill Bonacci. *Pal, supra*, at *6. As proof of Pal's accomplice liability, the Commonwealth was also 'permitted to present evidence that Cameron Kashmer provided a .38 caliber handgun to Pal in March 2013 in partial payment of an outstanding debt,' but was 'prohibited from mentioning (a) that Mr. Kashmer originally purchased that weapon from an unidentified male at Pal's garage, and (b) that

his indebtedness to Pal was attributable to a gambling debt. *Id.*
at *7.

(Doc. 15-6, pp. 62-64).

In affirming the trial court, the Pennsylvania Superior Court provided:

> "The admission of evidence is within the sound discretion
> of the trial court and will not be reversed absent an abuse of that
> discretion." *Commonwealth v. Begley*, 780 A.2d 605, 620 (Pa.
> 2001) (citations omitted). "Discretion is abused when the course
> pursued represents not merely an error of judgment, but where
> the judgment is manifestly unreasonable or where the law is not
> applied or where the record shows that the action is a result of
> partiality, prejudice, bias or ill will." *Commonwealth v. Martinez*,
> 917 A.2d 856, 859 (Pa.Super. 2007) (citations omitted).

Under Pennsylvania Rule of Evidence 404(b),

> Evidence of prior bad acts or unrelated criminal activity is
> inadmissible to show that a defendant acted in conformity with
> those past acts or to show criminal propensity. However,
> evidence of prior bad acts may be admissible when offered to
> prove some other relevant fact, such as motive, opportunity,
> intent, preparation, plan, knowledge, identity, and absence of
> mistake or accident.

*Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009),
*cert. denied*, 559 U.S. 1111 (2010)(citing Pa.R.E. 404(b)(1) and
(2)).

> Here, the trial court admitted evidence of Appellant's
> acquisition of a .38 caliber handgun, a photograph of Appellant
> displaying a handgun in the waistband of his pants, and
> Appellant's ownership and discharge of wadcutter bullets
> pursuant to the "opportunity" provision in Pa.R.E. 404(b)(2). The
> trial court reasoned that such evidence was admissible under the
> "opportunity" exception to establish that Appellant had the means
> to provide Dominick with the gun and bullets used to kill Bonacci.

- 47 -

The trial court's admission of the evidence of Appellant's acquisition of a .38 caliber handgun, possession of guns and bullets similar to the ones used to kill Bonacci, and a photograph of Appellant displaying a handgun in the waistband of his pants was well within its discretion. *See Commonwealth v. Williams*, 640 A.2d 1251, 1260-61 (Pa. 1994) (affirming admission of evidence showing a weapon in defendant's possession where it tended to prove that defendant had a weapon similar to the one used in perpetration of the crime).

(Doc. 15-9, pp. 17-18) (record citations omitted).

The second piece of evidence admitted at trial which the petitioner challenged in his post-trial motion was reference to matching "b 'hai" (Hindi for 'brother') tattoos which he and Dominick had imprinted on them. With respect to this challenge, the trial court noted that, while the petitioner sought to preclude any reference to "La Familia" tattoos and association, the petitioner did not seek to preclude any reference to the "b 'hai" tattoos, nor did he object to the admission of the evidence at the time of trial. The trial court indicated:

Although evidence was presented that Pal and Dominick both had tattoos of the Hindi word for "brother," Pal never objected to the introduction of that evidence, and in the process he waived his objection to that evidence under Pa.R.E. 103(a)(1)(A). *See Com. v. Hairston*, 84 A.3d 657, 672 (Pa. 2014) (defendant waived objection to victim-impact testimony by failing to object at trial), *cert. denied*, 135 S.Ct. 164 (U.S. 2014). Moreover, that tattoo evidence was admissible to demonstrate the close bond between Pal "the leader" and Dominick "the follower", as part of the Commonwealth's proof of their shared "plan" to kill Bonacci and the absence of any alleged surprise to Pal in that respect.

(Doc. 15-6, p. 65) (footnote omitted).

In affirming the trial court on this evidence, the Superior Court provided:

> Appellant next contends that the admission of the "b 'hai" tattoos of Appellant and Dominick were irrelevant and highly prejudicial because the Commonwealth allegedly introduced this to show that he and Dominick were gang members. However, Appellant did not object to admission of the "b 'hai" tattoos either before or during trial, and accordingly has not preserved the claim of error. *See* Pa.R.E. 103(a); Pa.R.A.P. 302(a) (issues cannot be raised for first time on appeal). As such, this claim is waived on appeal. *See Commonwealth v. Parker*, 847 A.2d 745, 749-50 (Pa.Super. 2004).

(Doc. 15-9, pp. 18-19).

The final piece of evidence which the petitioner challenged in his post-trial motion was evidence of his demeanor at a breakfast at a diner within hours of the murder. In addressing this challenge, the trial court found that "Pal's actions at the diner within a few hours of the murder were admissible to demonstrate his conscious effort to divert any investigatory focus upon him and to conceal his involvement with the murder of Bonacci." (Doc. 15-6, p. 66).

In affirming the trial court, the Pennsylvania Superior Court stated:

> Finally, Appellant contends that evidence of his demeanor during breakfast at Chick's Diner within hours of the murder should have been precluded because it had no relevance other than prejudicing Appellant before the jury. The trial court permitted such evidence, holding that it was admissible to

demonstrate Appellant's conscious effort to divert focus of the investigation from himself and to conceal his involvement in Bonacci's murder.

      The law does not require a court "to sanitize [a] trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa.Super. 2009) *appeal denied*, 74 A.3d 125 (Pa. 2013) (citation omitted). Based on the foregoing, we conclude that the trial court properly exercised its discretion when it allowed testimony regarding Appellant's actions in the diner within a few hours of the murder. *See Begley, supra* at 620; *Martinez, supra* at 859. Accordingly, Appellant's fourth issue lacks merit.

(Doc. 15-9, p. 19) (record citations omitted).

Collectively, the trial court found:

      The limited "other acts" evidence that was admitted during the trial bore the requisite "connective relevance" to the crimes at issue. Furthermore, the probative value of that evidence outweighed its potential for unfair prejudice. Accordingly, Pal has not established that it was an abuse of discretion to allow certain "other acts" evidence at trial, and his motion for new trial based upon the admission of that evidence will be denied.

(Doc. 15-6, p. 66).

In considering this aspect of the instant habeas petition, Judge Carlson initially found that, to the extent the petitioner is simply challenging the trial court's evidentiary rulings, his claim is not cognizable, as "it is well-settled that '[a] federal court considering a petition for habeas relief should not merely review state evidentiary errors, as any such mistakes 'are not

considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial.'" (Doc. 19, p. 36) (citations omitted).

Moreover, to the extent that the petitioner is claiming a violation of his due process rights, Judge Carlson found that, in order to show a due process violation arising from the admission of evidence, "the petitioner must show that the evidentiary error 'was of such magnitude as to undermine the fundamental fairness of the entire trial.'" (Doc. 19, pp. 36-37)(citations omitted). Given the trial court's thorough explanation of the admissibility of the evidence under the Pennsylvania Rules of Evidence, Judge Carlson found he could not conclude that the admission of the evidence at trial amounted to a due process violation. In fact, he found that it was clear that the evidence was probative of the petitioner's means, motive and opportunity, rather than his character, and was therefore properly admitted.

In his objections, the petitioner argues that, contrary to Judge Carlson's holding, he has demonstrated that the state courts' refusal to preclude the admissions of prior "bad acts" evidence entailed an "unreasonable application" of clearly established law as determined by the Supreme Court. In doing so, the petitioner cites to no law established by the Supreme Court. (Doc. 20, pp. 46-65). Upon review, the court finds that Judge Carlson gave

careful and thorough consideration to the petitioner's arguments regarding the evidence admitted. The court agrees with Judge Carlson's conclusion that the state courts did not abuse their discretion in allowing the challenged testimony, and moreover, the state courts' decisions were not an unreasonable application of clearly established law as determined by the Supreme Court.

As a final matter in this case, the Court must also determine whether to recommend granting a certificate of appealability ("COA") with respect to the Petitioner's claims. A COA can issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [if] jurists of reason would find it debatable whether the district court was correct in its [ ] ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). The court is of the view that reasonable jurists would not debate the court's determinations, and a COA should not be granted.

In light of all of the foregoing, an appropriate order shall issue.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: June 12, 2024**
19-1589-01

- 52 -